MEREDITH B. SWITZER, Judge
Teakqwanda Reed appeals the Workers' Compensation Commission's decision denying compensability of injuries she allegedly suffered on three different dates while employed by appellee First Step, Inc. First Step initially accepted Reed's first two injuries as compensable but ultimately controverted those two incidents in their entirety; the third incident was always controverted. Reed contends substantial evidence does not support the Commission's denial of compensability. We affirm in part and reverse and remand in part.
I. Facts
Reed alleged she injured her left shoulder and the left side of her neck on August 25, 2015, when she was lifting files out of a filing cabinet and felt a "pull" and "burning" on her left side from her neck and shoulder area down to her fingers. Dr. Mark Larey, who saw Reed on the date of the injury, diagnosed her with a sprain/strain of the neck and pain in her left arm. Although Dr. Larey's exam revealed no swelling, bruising, or wound of Reed's cervical spine, he noted a palpable spasm. Dr. Larey placed Reed on restricted duty and prescribed prednisone, Ultracet, and Flexeril. Dr. Larey saw Reed again on September 9, and he again noted a palpable spasm in Reed's cervical region. Reed was prescribed Xanax and remained on restricted duty.
A September 14 MRI of Reed's cervical spine was normal, without evidence of spinal canal stenosis or neural foraminal narrowing. Dr. Larey examined Reed a third time on September 15; her symptoms remained unchanged, and Dr. Larey again noted a palpable spasm in her cervical spine. Reed was prescribed Voltaren, Flexeril, and acetaminophen with codeine, and she remained on restricted duty. Dr. Larey saw Reed again on October 1 and 19 and on November 9 and 23. He noted palpable spasms of Reed's cervical spine at these visits and continued Reed on restricted duty. An electromyography and nerve conduction study (EMG) of Reed's left shoulder was performed on November 25. According to Dr. Larey, the results were "well within normal limits."
*428 Reed claimed her second injury occurred on December 16, 2015. As she was sitting in her chair filing papers in an accordion file on the floor, the chair came out from under her and she fell to the floor, hitting her right shoulder on her desk. According to Reed, when the chair flipped, it landed on her.
Dr. Larey examined Reed the same day. He noted her complaints of continued pain in her left shoulder from the first incident, and she complained of pain in her cervical, thoracic, and lumbar spine and in both shoulders due to the second injury. She also claimed that at the time of this injury, her left shoulder had not improved from the August 2015 incident. Dr. Larey noted that Reed was "diffusely tender" in the lumbar, thoracic, and cervical spine and in the shoulder-girdle regions, and she had decreased range of motion in her cervical spine and right shoulder. He diagnosed her with lumbar, thoracic, and cervical-spine strain in connection with her second injury. Reed remained on restricted duty.
An MRI of Reed's left shoulder was performed on January 14, 2016. The results of this MRI were "(1) degenerative changes of the acromioclavicular joint and findings suggesting impingement anatomy; (2) tendinosis of the supraspinatus tendon; and (3) degenerative changes humeral head." Dr. Larey examined Reed again on January 18, and although Reed continued to complain of pain and limited range of motion in her left arm and neck, Dr. Larey's examination of her left shoulder, shoulder girdle, and cervical spine was unremarkable; no palpable spasm was noted. Reed also complained of pain in her lower right back, her right thoracic-spine region, and her right shoulder; however, Dr. Larey noted no swelling, bruising, wound, or spasms in any of these areas. Dr. Larey discharged Reed from his care and returned her to regular duty on January 18 with instructions to complete her physical-therapy regimen. A physical-therapy note dated February 19, 2016, the last day of Reed's physical therapy, included a diagnosis of "right shoulder strain, lumbar strain with radiating right hip pain, spasms."
Reed was subsequently seen for her right-shoulder pain by Dr. Shahryar Ahmadi on August 2. An MRI of Reed's right shoulder, performed on August 23, revealed the following impressions:
(1) Findings suggestive of calcific tendinitis involving the infraspinatus tendons with increased signal within the infraspinatus and conjoined tendons which may be related to inflammatory changes from crystal deposition. Small amount of fluid in the subacromial/subdeltoid bursa.
(2) Severe acromioclavicular osteoarthritis.
(3) Small paralabral cysts adjacent to the mid anterior labrum which may be related to an underlying degenerative labral tear.
Based on the MRI results, Dr. Ahmadi recommended right-shoulder arthroscopy and debridement with possibility of rotator-cuff repair and biceps tenotomy for Reed.
On October 12, Dr. Kirk Reynolds performed an independent medical examination regarding Reed's right-shoulder symptoms from her December 16, 2015 injury. Dr. Reynolds noted Reed was tender to palpitation throughout the shoulder girdle, and her Neer and Hawkins impingement tests were positive. Dr. Reynolds reviewed the August 23 MRI of Reed's right shoulder and noted a
focus of calcific tendinitis involving the posterior fibers of the supraspinatus tendon and the majority of the infraspinatus tendon. Associated tendinopathy is *429 seen in the remaining supraspinatus and infraspinatus tendons. There is reactive subacromial and subdeltoid bursitis. Degenerative arthrosis is seen in the acromioclavicular joint. No full thickness rotator cuff tear is seen. The long head biceps tendon is not well visualized on theses images; however, it is present.
Dr. Reynolds assessed Reed with right-shoulder pain associated with calcific tendinitis, acromioclavicular arthrosis, and biceps tendinitis. When asked whether there were any objective findings of Reed's right shoulder related to the mechanism of injury, he opined,
Objective findings are consistent with calcific tendinitis, biceps tendinitis and acromioclavicular arthrosis. It is my professional medical opinion that these represent findings of chronic disease in the shoulder. They are inconsistent with a single, traumatic episode. Also, I cannot correlate the mechanism of injury with any of the above findings. Certainly, less than 51% of the current pathology in Ms. Reed's right shoulder is associated with her work-related injury which occurred on [December] 16, 2015.
Although Dr. Reynolds agreed with Dr. Ahmadi's proposed surgical treatment, as it was the standard of care for calcific tendinitis unresponsive to nonoperative management, he opined that the MRI findings were more consistent with chronic findings and not consistent with a single, traumatic injury. He returned Reed to full duty, concluded Reed had reached maximum medical improvement as of October 12, 2016, and assigned her a 0 percent permanent-impairment rating of the right shoulder and of the whole person. Dr. Reynolds reiterated this opinion in a follow-up letter dated November 27.
In both a letter and a deposition, Dr. Ahmadi vacillated between whether Reed's shoulder pathology was chronic in nature or caused by an acute injury; he said it could be either one. He stated that calcification of the tendon could be acute, it could be chronic, or it could be both. Dr. Ahmadi disagreed with Dr. Reynolds that the calcification of the tendon was inconsistent with a single traumatic episode; however, he stated that he honestly did not think anyone could say for sure whether the calcification was related to the trauma. When pressed by Reed's attorney, Dr. Ahmadi stated he could not say with 100 percent certainty the calcification was due to the fall, but his opinion was that the cause of Reed's need for surgery was more than 50 percent likely due to trauma.
Reed's third alleged injury occurred on July 17, 2017, while she was placing charts into a box on top of a filing cabinet. When the box began to slide off the top of the cabinet, she caught the box and was trying to push it back on the filing cabinet when she felt pain in her right shoulder and down her right arm.
Reed was seen on the same day by ANP Jennifer Scott. In her examination, Scott did not note any swelling, bruising, or wound of Reed's right shoulder; she did, however, note a palpable spasm to the right trapezius region. Scott further noted limited range of motion due to pain and a positive Hawkins test. She diagnosed Reed with "pain in right shoulder" and "other muscle spasm" and prescribed her Zanaflex three times a day as needed for spasms. Scott believed the cause of Reed's problems was work related. She placed Reed on restricted duty and also requested an MRI of Reed's right shoulder. Reed was seen for a follow-up visit with Dr. Larey on July 25. He noted Reed's continued right-shoulder pain with limited range of motion. The diagnosis was again right-shoulder pain and other muscle spasm, although there was no spasm noted in the examination notes.
*430 The MRI requested by ANP Scott was performed on July 28, 2017. The impression from that MRI stated, "Calcification in the distal supraspinatus tendon is again seen consistent with tendinosis changes. There is a little more thickening and slight increased signal in the more proximal tendon and findings could be slightly more prominent there. Mild impingement secondary to hypertrophic changes in the acromioclavicular joint."
ANP Scott reviewed the MRI results with Reed in a follow-up visit on August 7. She referred Reed for physical therapy for right-shoulder pain and placed her on restricted duty. ANP Scott saw Reed again on September 1 and continued Reed on restricted duty.
Dr. Steven Nokes reviewed both MRIs of Reed's right shoulder, and it was his opinion that the MRIs demonstrated "moderate AC joint hypertrophic changes with mild compression of the supraspinatus musculotendinous junction along with moderate chronic calcific tendinosis of the supraspinatus and infraspinatus tendons, without a cuff tear." He further opined these findings were all degenerative in nature.
Following a hearing on Reed's claims for workers'-compensation benefits, the ALJ found Reed had sustained a compensable soft-tissue injury to her cervical spine on August 25, 2015. The ALJ also found that she had received appropriate medical benefits for this injury and that the injury had resolved no later than December 17, 2015. The ALJ denied benefits for Reed's remaining alleged injuries, finding she failed to prove by a preponderance of the evidence that she sustained compensable injuries. The Commission affirmed and adopted the ALJ's opinion.[1]
II. Standard of Review
In appeals involving workers'-compensation claims, this court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. Webb v. Wal-Mart Assoc., Inc. , 2018 Ark. App. 627, 567 S.W.3d 86. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. Tyson Foods, Inc. v. Turcios , 2015 Ark. App. 647, 476 S.W.3d 177. The issue on review is not whether the appellate court might have reached a different result; we affirm if reasonable minds could reach the Commission's conclusion. Ark. Highway & Transp. Dep't v. Wiggins , 2016 Ark. App. 364, 499 S.W.3d 229. When the Commission denies a claim due to the claimant's failure to meet his or her burden of proof, the substantial-evidence standard of review requires this court to affirm the Commission's decision if the opinion displays a substantial basis for the denial of relief. Webb , supra . We defer to the Commission on issues involving credibility and the weight of the evidence. Frost v. City of Rogers , 2016 Ark. App. 273, 492 S.W.3d 875. It is also the Commission's duty to resolve conflicts in medical testimony and evidence. Wiggins , supra .
To prove the occurrence of a specific-incident compensable injury, the claimant must establish that (1) an injury occurred arising out of and in the scope of employment; (2) the injury caused internal *431 or external harm to the body that required medical services or resulted in disability or death; and (3) the injury was caused by a specific incident and is identifiable by time and place of occurrence. Ark. Code Ann. § 11-9-102(4)(A)(i) (Repl. 2012). A compensable injury must be established by medical evidence supported by objective findings. Ark. Code Ann. § 11-9-102(4)(D). "Objective findings" are those findings that cannot come under the voluntary control of the patient. Ark. Code Ann. § 11-9-102(16)(A)(i). Complaints of pain are not to be considered objective medical findings. Ark. Code Ann. § 11-9-102(16)(A)(ii)(a) . The burden of proving a specific-incident compensable injury is the employee's and must be proved by a preponderance of the evidence. Ark. Code Ann. § 11-9-102(4)(E)(i).
III. Cervical Spine and Left Shoulder-August 25, 2015
Reed claims she suffered an injury to both her cervical spine and her left shoulder as a result of the August 25, 2015 incident. Regarding her cervical-spine injury, the Commission found that Reed suffered a compensable soft-tissue injury, shown by objective medical findings in the form of spasms and that the injury had resolved no later than December 17, 2015 (the day after the second injury). Reed does not challenge this decision on appeal.
Regarding her left shoulder, the Commission found Reed had failed to prove her left-shoulder issues were causally connected to the August 25 incident. Specifically, the Commission found,
Regarding the claimant's alleged left shoulder injury of August 25, 2015, the claimant has again failed to satisfy the objective medical findings requirement. Hence, the record does not contain any medical evidence supported by objective findings that the claimant sustained a trauma injury to her left shoulder. The EMG performed on November 25, 2015 by Dr. Hardy did not demonstrate any abnormalities of the upper left extremity. An MRI on the left shoulder was performed on January 14, 2016, which revealed only degenerative changes, which would have pre-existed the August 25, 2015 event. Hence, the claimant has failed to establish a causal connection between these abnormalities identified in the MRI and her work incident of August 25, 2015. While I recognize that the claimant was prescribed Flexeril and Voltaren, there is insufficient evidence to support a finding that the Flexeril and Voltaren, or any of the medications, were prescribed for a specific objective medical finding. The prescription alone is not enough to constitute an objective finding.
Reed argues that by initially accepting the August 25, 2015 injury as compensable, and then denying additional care for her left-shoulder injury due to a lack of objective medical evidence, she was essentially being required to produce objective medical evidence that she remained in her healing period. We disagree. Although initially accepted as compensable, First Step ultimately controverted Reed's August 2015 injury in its entirety. It was Reed's burden to prove by a preponderance of the evidence she suffered a compensable specific-incident injury, see Ark. Code Ann. § 11-9-102(4)(E)(i), which included proof of objective medical findings of an injury and a causal connection between the injury and the incident.
There were no objective medical findings from the tests performed on Reed's left shoulder that would indicate she suffered a specific-incident injury on August 25, 2015. Reed's EMG of her left shoulder was within normal limits, and although the MRI of her left shoulder revealed objective *432 medical findings of degenerative changes, the Commission found no causal connection between the degenerative changes and the August 2015 incident. There is substantial evidence to support the Commission's decision that Reed failed to prove her left-shoulder problems were causally connected to the August 25, 2015 incident because as they were degenerative in nature. Accordingly, we affirm on this issue.
IV. Cervical, Thoracic, and Lumbar Spine-December 16, 2015
Reed argues that the Commission erred in finding there were no objective findings of injuries to her cervical, thoracic, and lumbar spine as a result of the December 16, 2015 incident. We reject Reed's contention and affirm on this point because there is substantial evidence to support the Commission's finding.
Dr. Larey saw Reed on the date of the injury. He found her to be tender in her lumbar, thoracic, and cervical-spine areas, with a decreased range of motion in her cervical spine; however, on examination, Dr. Larey was "really unable to appreciate any specific muscular spasms." Again on January 18, 2016, Dr. Larey noted no spasms in the cervical, thoracic, or lumbar spine. When asked at the hearing about objective medical findings for these injuries, Reed's counsel noted she had pain and was diffusely tender. But pain is not an objective finding. Ark. Code Ann. § 11-9-102(16)(A)(ii).
On appeal, Reed argues that objective medical findings were documented in a physical-therapy note from February 19, 2016, which stated under the heading of diagnosis, "Right shoulder strain, lumbar strain with radiating right hip pain, spasms." We are not persuaded that the notation in the physical-therapy note constitutes sufficient evidence of objective medical findings because Dr. Larey found no evidence of spasms on the day of the injury or on the follow-up visit approximately one month later. By comparison, the physical-therapy notation was made two months after the incident, and it did not indicate where the spasms were located. Substantial evidence supports the Commission's decision, and we affirm on this issue.
V. Right Shoulder-December 2015 and July 2017 Incidents
Reed's alleged right-shoulder injuries from the December 2015 and July 2017 incidents were addressed together in the Commission's opinion:
Here, the claimant underwent two MRIs (on August 23, 2016 and July 28, 2017) of the right shoulder. Dr. Reynolds (with respect to the first MRI of August 23, 2016), Dr. Nokes, and Dr. Ahmadi have all opined that the findings on these MRIs are degenerative in nature. Under these circumstances, I find that the claimant failed to provide medical evidence supported by measurable objective findings establishing a specific incident injury to her right shoulder. The record does not contain any medical evidence supported by objective findings that the claimant sustained a trauma injury to her right shoulder. None of the medications of record, including the Flexeril and Voltaren, were prescribed for "muscle spasm, swelling or bruising" or any other objective findings relating to the claimant's right shoulder.
Regarding her December 2015 right-shoulder injury, Reed argues the Commission erred when stating there were no *433 objective findings of an acute injury from either incident.[2] Reed also contends the positive findings on the Neer and Hawkins impingement tests conducted by Dr. Reynolds in his independent medical examination constitute objective medical findings. While the MRI indicated evidence of degenerative changes, we need not determine whether the Neer and Hawkins impingement tests constitute objective medical findings because the Commission found Reed's right-shoulder issues were not causally connected to the December 2015 incident.
Reed asserts that Dr. Ahmadi's deposition provides the causal connection between her right-shoulder issues and her work-related injury. Dr. Ahmadi's opinion as to the cause of the calcification of the tendon and the need for surgery to remove the calcium and repair the rotator-cuff tendon was equivocal at best. He stated that degenerative changes like the ones seen in Reed's right shoulder could occur either gradually over time or after an injury. He further stated one could not tell what caused the calcification; the changes could be chronic or a result of an acute injury. He finally stated that he believed it to be more likely from a fall, but he could not say with 100 percent certainty.
Both Dr. Reynolds and Dr. Nokes clearly opined that Reed's right-shoulder problems were degenerative, while Dr. Ahmadi stated Reed's issues could either be degenerative or caused by an injury. The Commission has the duty to resolve conflicts in medical testimony and evidence. Wiggins , supra . The Commission was not required to believe Dr. Ahmadi's opinion that Reed's issues were more likely to have been caused by an acute injury, especially considering the fact that both Dr. Reynolds and Dr. Nokes believed Reed's problems to be degenerative in nature, not caused by an acute injury. There is substantial evidence from the opinions of Dr. Reynolds and Dr. Nokes to support the Commission's finding that Reed's right-shoulder issues were not causally connected to her December 2015 incident; we therefore affirm the Commission's denial of benefits with respect to the December 2015 injury.
Reed also challenges the Commission's finding that there were no objective medical findings with respect to her July 2017 right-shoulder injury. We agree there is not substantial evidence to support the Commission's finding on this issue.
On July 17, 2017, the date of the alleged third injury, Reed was seen by ANP Jennifer Scott. Although no swelling, bruising, or wound was noted, Scott's clinic note stated, "Palpable spasm noted to right trapezius region. Limited ROM due to pain. No crepitance with PROM. Hawkins sign + Empty cart test +." Scott diagnosed Reed with "pain in the right shoulder and other muscle spasm " and prescribed Zanaflex one to three times daily "as needed for spasm ." (Emphasis added.) Muscle spasms constitute objective medical findings. Walls Farms, LLC v. Hulsey , 2017 Ark. App. 624, 534 S.W.3d 771. Therefore, the Commission's finding that the record lacked evidence of objective medical findings of a trauma injury is not supported by substantial evidence, as spasms were clearly noted from the date of the injury.
*434 However, our analysis does not end there. There were no findings made by the Commission regarding a causal connection between the muscle spasm and the July 17, 2017 incident. While First Step asserts that the spasm was indicative of a soft-tissue injury that has since healed, the Commission made no finding to that effect. The Commission has the duty to make factual findings and conclusions "with sufficient detail and particularity to allow us to decide whether its decision is in accordance with the law." Parker v. Advanced Portable X-Ray, LLC , 2014 Ark. App. 11, at 5, 431 S.W.3d 374, 379. This court does not review Commission decisions de novo on the record, nor do we make findings of fact the Commission should have made but did not. Stallworth v. Hayes Mech., Inc. , 2013 Ark. App. 188, 2013 WL 1010392. If the Commission fails to make specific findings of fact on an issue, it is appropriate for this court to reverse and remand the case for such findings to be made by the Commission. Id. Because the Commission failed to make any causal-connection findings in connection with the July 17, 2017 injury, we reverse and remand for it to do so.
Affirmed in part; reversed and remanded in part.
Gladwin and Hixson, JJ., agree.

Arkansas law permits the Commission to adopt the ALJ's opinion as its own. Ark. Highway & Transp. Dep't v. Work , 2018 Ark. App. 600, 565 S.W.3d 138. If the Commission adopts the ALJ's opinion, the ALJ's findings of fact and conclusions of law are made the Commission's findings of fact and conclusions of law, and this court considers both the ALJ's opinion and the Commission's majority opinion on appellate review. Univ. of Ark. at Pine Bluff v. Hopkins , 2018 Ark. App. 578, 561 S.W.3d 781.

In her argument, she points to pain; however, as discussed above, pain is not an objective medical finding.